USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/25/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

170 Mercer LLC,

           Plaintiff,

    –v–

Rialto Capital Advisors, LLC, *et al.*,

           Defendants.

20-cv-2496 (AJN)

MEMORANDUM OPINION & ORDER

ALISON J. NATHAN, District Judge:

    170 Mercer LLC, the mortgagor of a commercial condominium unit, brought this suit against its lender and the lender's loan servicer claiming that they unreasonably withheld consent to transfer Mercer's loan to a prospective purchaser. The lender and the loan servicer (collectively, "Rialto") move to dismiss. Rialto contends that a letter executed between the parties before negotiations concerning the proposed sale bars Mercer's claim; that the loan agreement grants Rialto total discretion to reject proposed assignments; and that a claim for money damages is unavailable. The Court concludes that it cannot consider the pre-negotiation letter on a motion to dismiss and that Mercer states a claim under the loan agreement. It declines, at this stage, to decide whether money damages are available. It thus denies Rialto's motion.

**I.    Background**

    For purposes of this motion, the Court takes as true all factual allegations in Mercer's amended complaint ("AC"), Dkt. No. 13, and draws all reasonable inferences in its favor.

In February 2019, Mercer borrowed $4.93 million secured by a mortgage on a commercial condominium unit in the upscale SOHO district of Manhattan. AC ¶¶ 10–12, 15. Rialto administers the loan. *Id.* ¶ 14. A high-end jewelry business occupies the unit under a "triple net" lease, which requires the tenant to pay for all expenses, utilities, and repairs. *Id.* ¶ 16.

The loan agreement between Mercer and Rialto allows Mercer to transfer the loan "with [Rialto's] consent, not to be unreasonably withheld." *Id.* ¶ 35; Loan Agreement, Dkt. No. 13-1, § 5.2.10(h). It also sets out other requirements for prospective transferees. AC ¶ 36. For example, "[t]he proposed transferee . . . must have the creditworthiness, reputation and qualifications to [Rialto's] reasonable satisfaction." Loan Agreement § 5.2.10(h)(iii). The transferee must also "have an aggregate net worth and liquidity reasonably acceptable to [Rialto]." *Id.* § 5.2.10(h)(iv). The agreement contains a few more similar requirements. The agreement also states that whenever it grants Rialto the authority to "to decide whether arrangements or terms are satisfactory or not satisfactory" that decision "shall (except as is otherwise specifically herein provided) be in the sole discretion of [Rialto] and shall be final and conclusive." *Id.* § 10.2. The agreement's exclusive-remedies provision states that for any "claim . . . that [Rialto] or its agents have acted unreasonably . . . neither [Rialto] nor its agents shall be liable for any monetary damages, and [Mercer's] sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment." *Id.* § 10.12.

In November 2019, Prosperous View LLC agreed to purchase the unit from Mercer for $6.7 million subject to Rialto's approval of its assumption of the loan, which had an outstanding balance of $4.93 million. AC ¶ 17. The principal of Prosperous View manages real estate in New York and New Jersey worth about $5 million and has a net worth of about $8 million. She

agreed to guarantee the loan. *Id.* ¶ 20. She also agreed to set aside a $350,000 deposit for the unit and an additional $1.8 million from another property sale for payments on the loan. *Id.* ¶ 21. As part of its application materials, Prosperous View submitted an operating budget showing net rental income of about $391,000. *Id.* ¶ 22. The loan provides for interest-only payments through maturity in an annual amount of $266,000 for seven years. *Id.* ¶ 23. Thus, the "debt service coverage ratio"—that is, the ratio of operating income to required debt payments—was 1.5. *Id.* Prosperous View intended to maintain an identical business plan to Mercer, and the long-term tenant was to remain in the unit under its triple net lease. *Id.* ¶ 24. Prosperous View also submitted a resume of its principal reflecting her extensive property-management experience, reference letters from other lending institutions, and an additional one-year letter of credit for $374,000 to serve as additional collateral for the loan. *Id.* ¶¶ 25–28.

Although not mentioned in Mercer's complaint, Rialto alleges that the parties entered into a pre-negotiation letter agreement governing the parties' negotiations about transferring the loan to Prosperous View. In that letter agreement, which Rialto included as an exhibit in support of its motion to dismiss, each party "completely, irrevocably and unconditionally releases and forever discharges" other parties to the agreement "from any and all liabilities, claims and demands . . . arising out of or relating to all or any Negotiations." Pre-Negotiation Letter, Dkt. No. 16-1, ¶ 8; *see also id.* ¶ 6 (more or less the same). It also provides that "The terms of this Agreement and our Negotiations will not supersede the Loan Documents. The Parties shall in all cases remain subject to and shall act in accordance with the terms of the Loan Documents." *Id.* ¶ 3.

The negotiations did not succeed. After Mercer requested Rialto's consent to the assignment, Rialto insisted on a $35,000 application fee to begin the discussion—seven times

3

the $5,000 application fee specified in the loan agreement.  *Id.* ¶ 38; *see* Loan Agreement § 5.2.10(h).  In December 2019, Rialto's Asset Supervisor said that she had recommended approval of the assignment.  AC ¶ 32.  However, just a month later, Rialto demanded an additional $1 million cash deposit in escrow.  *Id.* ¶ 33.  After some back-and-forth, Rialto lowered its additional collateral requirement from $1 million to $850,000.  *Id.* ¶ 48.  Mercer offered to pay down the principal balance by $850,000 instead, and Rialto refused.  *Id.* ¶ 49.  Mercer then offered to instead retain a 20% interest in the unit; Rialto responded that it would only consider the proposal if Mercer paid another application fee.  *Id.* ¶¶ 50–51.

Negotiations continued to flounder as Prosperous View's deadline for closing came and went.  Mercer then brought this suit claiming Rialto breached its obligations under the loan agreement by unreasonably withholding consent for the transfer.

## II.  Legal Standard

"To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  When determining whether a complaint states a claim, a court accepts as true all allegations in the complaint and draws all reasonable inferences in favor of the non-moving party.  *Id.*

### III. Discussion

#### A. The Court Will Not Consider the Pre-Negotiation Letter

Courts ordinarily may not consider material outside the complaint on a motion to dismiss. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citing Fed. R. Civ. P. 12(b)). However, the Court may consider documents incorporated into the complaint by reference and those that are "integral" to the complaint. *Id.* at 153. "A document is integral to the complaint where the complaint relies heavily upon its terms and effect. Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotations from the document is not enough." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (cleaned up). "[E]ven if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Mercer does not include or quote from the pre-negotiation letter in its complaint. It does not assert any claims under the pre-negotiation letter. It does not mention it. Nonetheless, Rialto contends that the pre-negotiation letter is "integral" to Mercer's complaint. Under controlling Second Circuit precedent, Rialto is wrong.

Rialto conflates "integral" with "important." A document is integral to a complaint only when a complaint relies on it; that is, when it provides the basis for the plaintiff's claims or underlies the plaintiff's factual allegations. *Goel*, 820 F.3d at 559. Mercer does not "rel[y] heavily upon" the pre-negotiation letter's "terms and effect." *Id.* Its claims arise exclusively under the loan agreement. The pre-negotiation letter is, at most, a separate contract that could limit Mercer's remedies under the loan agreement. Evidence does not become integral to a

5

complaint, and thus within the purview of a motion to dismiss, simply because it might furnish a party with a robust defense.

The Court also will not consider the pre-negotiation letter because Mercer disputes whether it was properly executed. *See Faulkner*, 463 F.3d at 134. Rialto did not sign the agreement. *See* Pre-Negotiation Letter, at *6. Rialto may be correct that New York's statute of frauds does not bar a party who has not signed a contract from seeking to enforce it. *See* Reply Br., Dkt. No. 19, at 4 (citing *Qualis Care, L.P. v. Care Net, La Sierra, L.P.*, No. 94-cv-7051 (HB), 1996 WL 99389, at *2 (S.D.N.Y. Mar. 7, 1996)). However, Rialto must still prove that the parties agreed to it—that is, that they reached a meeting of the minds. It is not evident from the four corners of the letter that they did.

Finally, the Court notes that it is skeptical that the pre-negotiation letter bars Mercer's claims under the loan agreement. The letter forbids claims "with respect to the Negotiations" and claims "caused by or arising out of or relating to all or any Negotiations." Pre-Negotiation Letter ¶¶ 6, 8. However, it also states that the terms of the letter "will not supersede the Loan Documents." *Id.* ¶ 3. The most natural reading of these provisions, taken together, is that the pre-negotiation letter bars claims based on statements made during the negotiations but leaves intact the parties obligations under the loan agreement, including Rialto's obligation not to unreasonably withhold consent to a transfer. Thus, it is not obvious that the letter, even if properly considered, would require dismissal of Mercer's claims.

      **B.**      **Mercer States a Claim Under the Loan Agreement**

Under New York law, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002). Courts look first to the unambiguous meaning of a

6

contract's terms. *Id.* "However, one portion of a contract should not be read so as to negate another portion." *U.S. Bank Nat'l Ass'n as Tr. for GSAMP Tr. 2007-HE1 v. Goldman Sachs Mortg. Co., L.P.*, No. 19-cv-2305 (AJN), 2020 WL 6873413, at *4 (S.D.N.Y. Nov. 23, 2020) (cleaned up) (quoting *Bombay Realty Corp. v. Magna Carta, Inc.*, 790 N.E.2d 1163, 1165 (N.Y. 2003)). "The agreement must be 'read as a whole to determine its purpose and intent.'" *Natixis Real Estate Capital Tr. 2007-HE2 v. Natixis Real Estate Holdings, LLC*, 50 N.Y.S.3d 13, 18 (App. Div. 2017) (quoting *W.W.W. Assoc., v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)).

The dispute in this case concerns two provisions that appear at first glance to be at odds. Subsection 5.2.10(h) requires that Rialto's consent to transfer the loan is "not to be unreasonably withheld." And it lists requirements that a prospective transferee must satisfy to Rialto's "reasonable satisfaction." These provisions would seem to impose a requirement of reasonableness. Section 10.2, on the other hand, states that Rialto "shall (except as is otherwise specifically herein provided)" have "final and conclusive" discretion to decide whether terms are satisfactory or unsatisfactory. Mercer claims that Rialto's rejection of Prosperous View was unreasonable under § 5.2.10(h). Rialto counters with § 10.2, which in its view means it can never be liable for withholding consent for a transfer.

New York law requires the Court to read these provisions harmoniously. *See Bombay Realty*, 790 N.E.2d at 1165. The Court has no trouble doing so. Section 10.2 may grant Rialto unfettered discretion in deciding whether terms are satisfactory, but it does so only "except as is otherwise specifically herein provided." Subsection 5.2.10(h) otherwise specifically provides. It states that consent to a transfer "shall not be unreasonably withheld," and thus limits Rialto's "final and conclusive" discretion as contemplated by the parenthetical in that sentence. In the

7

same way, the phrase "reasonable satisfaction" in § 5.2.10(h)(iii), (iv), and the rest means that Rialto's satisfaction must be reasonable.

Other provisions of the loan agreement reinforce this conclusion. Section 10.12 limits the remedies for any "claim . . . that [Rialto] or its agents have acted unreasonably." This provision would be pointless if no such claims were cognizable under the agreement. The Court also observes that in some instances, the agreement requires only Rialto's "satisfaction," not its reasonable satisfaction. *See, e.g.*, *id.* § 6.4(b)(ii). And although § 5.2.10(h) requires Rialto's consent, it also sets forth the general principle that "[Mercer] shall have the right to unlimited Transfers of the Property in its entirety." Reading the agreement as a whole, its "purpose and intent" is to require Rialto to act reasonably when withholding its consent to transfers. *W.W.W. Assoc.*, 566 N.E.2d at 642.

Rialto also contends that Mercer fails to state a claim because it does not specifically allege compliance with each requirement in § 5.2.10(h)—for example, that it does not allege that Prosperous View's principal would be a "Qualified Manager" as required by the agreement. Mercer pleads plenty. It alleges that the principal of Prosperous View had extensive property management experience, reference letters, and an adequate business plan. AC ¶¶ 20–23. It alleges generally that she met the agreement's requirements and that Rialto's Asset Supervisor had initially approved her. *Id.* ¶¶ 30–32. The Court does not agree that Mercer needed to formalistically recite each criterion under § 5.2.10(h) in its complaint. Its allegations suffice to plausibly allege that the prospective transferee was qualified and that Rialto acted unreasonably. Of course, whether Prosperous View was qualified and whether Rialto acted unreasonably are questions of fact that remain for proof. But Mercer's allegations are enough to survive a motion to dismiss.

### C. The Court Will Not Limit Available Remedies Now

Section 10.12 of the loan agreement forbids claims for damages and limits Mercer's remedies to equitable relief. However, as this Court has held on several occasions, New York law may permit a monetary award in equity when a contract's exclusive remedies fail. *See, e.g.*, *U.S. Bank*, 2020 WL 6873413, at *7; *Ace Sec. Corp. Home Equity Loan Tr., Series 2007-HE3 ex rel. HSBC Bank USA, Nat. Ass'n v. DB Structured Prod., Inc.*, 5 F. Supp. 3d 543, 553–55 (S.D.N.Y. 2014); *see also Matter of Part 60 Put-Back Litig.*, No. 84, 2020 WL 7497993, at *6 (N.Y. Dec. 22, 2020). "[W]here the granting of equitable relief appears to be impossible or impracticable, equity may award damages in lieu of the desired equitable remedy." *Doyle v. Allstate Ins. Co.*, 136 N.E.2d 484, 486 (1956). The Court sees no need to decide this question now, which may turn on the development of the factual record. It thus declines to limit the remedies available to Mercer at this stage of the litigation.

### Conclusion

For the foregoing reasons, the Court DENIES Rialto's motion to dismiss (Dkt No. 15). The Court DENIES as moot Rialto's earlier motion to dismiss (Dkt. No. 7) filed before Mercer amended its complaint and DENIES as moot the letter motion for oral argument (Dkt. No. 20). The discovery schedule set out in the case management plan entered August 20, 2020 (Dkt. No. 26), as amended on November 17, 2020 (Dkt. No. 30), remains in effect.

This resolves Docket Numbers 7, 15, and 20.

SO ORDERED.

Dated: March 25, 2021
      New York, New York

                                        ALISON J. NATHAN
                                      United States District Judge